1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRIAN N. HALL; JEAN M. HALL, | ) | 1:06-cv-0123 OWW SMS |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM DECISION AND |
| | ) | ORDER RE: DEFENDANTS' |
| v. | ) | MOTION FOR NEW TRIAL OR, IN |
| | ) | THE ALTERNATIVE, REMITTITUR |
| NORTH AMERICAN INDUSTRIAL | ) | |
| SERVICES, INC., etc., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Before the Court is the Motion of Defendant North American Industrial Services, Inc. ("NAIS") for New Trial or, in the Alternative, Remittitur following a 15 day jury trial in which Plaintiff Brian Hall was awarded total damages of $27,264,746.20 and Jean Hall, his wife, was awarded $250,000.00 for loss of society.  The jury allocated fault among the parties, 75% to NAIS, 20% to AES Mendota LLP, Plaintiff's employer, and 5% to Plaintiff, Brian Hall.  After calculating offsets and deductions, judgment was entered December 12, 2007, for Brian Hall in the amount of $20,018,811.00, as follows:

Past wage loss (reduced by 5%) -          $190,867.00

Future wage loss (reduced by 5%) -         $1,887,847.00

1

Past medical bills (actual by stipulation) $1,085,961.00

Future medical bills (reduced by 5%) -     $2,123,800.00

Less offset for workers'
compensation benefits of 21.7736%
(calculated by total of economic
damages as a percent of total damages) -     $269,664.94

Past non-economic damages (reduced
to 75%) -                                   $11,250,000.00

Future non-economic damages (reduced
to 75%) -                                    $3,750,000.00

Judgment was entered for Jean Hall on her loss of society claim,[1] reduced to 75%, in the amount of $187,500.00.

Defendant NAIS advances two primary contentions:  (1) the award of past non-economic damages is  excessive and against the clear weight of the evidence; (2) the jury's apportionment of responsibility among the parties is against the clear weight of the evidence.

Defendant seeks a new trial or, alternatively, a conditional new trial subject to Plaintiff's acceptance of a substantial remittitur of past non-economic damages and a reasonable reassessment of the jury's apportionment of fault.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the Courts of the United States.  Fed. R. Civ. P. 59(a)(1).  Rule 59 does not

---

[1] Plaintiff waived any claim for loss of consortium.

2

specify the grounds on which a new trial may be granted. *Zhang v. Am. Gen. Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the Court is "bound by those grounds that have historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Passatino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510, n.15 (9th Cir. 2000) (the trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice). *Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007). The stated ground for excessive non-economic damages is that the awards are against the clear weight of the evidence. No other damage awards are challenged.

Rule 59(a) establishes a different standard of review for bench trials than for jury trials; *Molski v. M.J. Cable, Inc.*, *surpa*, at p. 729, n.4, after a jury trial, a district court has "the duty . . . [upon a Rule 59 motion] to weigh the evidence as [the Court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the Court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990), quoted in *Molski*, 481 F.3d at p. 729. In general, a Court should grant a new trial only when it "is left with the definite and firm conviction that a mistake has

been committed." *Landess Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987). A District Court may not grant a new trial simply because it would have arrived at a different verdict. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

When reviewing an excessive damages claim, a district court, after viewing the evidence in a light most favorable to the prevailing party, concludes that a damage award is excessive, it must grant a new trial on damages unless the prevailing party accepts a remittitur which the Court considers justified. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). The district court may grant a new trial on damages even though substantial evidence supports the jury's verdict. *Oltz v. St. Peter's Community Hospital*, 851 F.2d 1440, 1452 (9th Cir. 1988). The standard to be applied by the trial court in remitting a judgment is to the maximum amount sustainable by proof. *D. & S. Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). This rule prevents the Court's substitution of its judgment for that of the jury. *Bonura v. CSEA Land Service, Inc.*, 505 F.2d 665, 669 (5th Cir. 1974); *see also, Informatica Corp. v. Business Objects Data Integration, Inc.*, 2007 WL 2344962 (N.D. Cal. 2007).

In the Ninth Circuit, in reviewing a jury's damages award, the district court must uphold the jury's "finding of the amount of damages unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984); *Lambert v. Ackerly*, 180 F.3d

**4**

1  997, 1011 (9th Cir. 1999) (en banc) *cert. denied*, 528 U.S. 1116

2  (2000).  Objective evidence to support emotional distress awards

3  required by other Circuits is not the law of the Ninth Circuit,

4  which holds that damages for emotional distress are subjective,

5  may be based on testimony alone, appropriate inference from

6  circumstances, or by reference to an injured party's conduct and

7  the observations of others.  *Zhang v. American Gen. Seafoods,*

8  *Inc., supra*, at p. 1040 (discussing cases).

9       Reference to the Third Circuit authority discussed by the

10 parties is unnecessary in view of the clearly established

11 standards for review of damage awards in diversity cases in this

12 Circuit and under California law.

13

14            ANALYSIS OF EXCESSIVE NON-ECONOMIC DAMAGES CLAIM

15 A.   THE *BUELL-WILSON* CASE

16      The most recent ruling of the California Courts on excessive

17 non-economic damages, applicable in this diversity case, is the

18 March 10, 2008, decision of the California Court of Appeal,

19 Fourth Appellate District, in a case cited by Plaintiff, *Buell-*

20 *Wilson v. Ford Motor Co.*, on remand from the California Supreme

21 Court, after a grant of certiorari and vacatur of the damage

22 awards, 2008 WL 625016 (Appeal Nos. D045154, D45579) ("Buell").

23 On remand, the California Court of Appeals: (1) reduced a non-

24 economic damages award originally in the sum of $105,000,000.00;

25 reduced by the trial court to $65,393,996.00, further reduced on

26 remand to $18,000,000.00; (2) reduced an award of punitive

27 damages originally $246,000,000.00, reduced to $75,000,000.00 by

28 the trial court, and further reduced on remand to $55,000,000.00;

1   and (3) affirmed reduction by the trial court of an award of a

2   husband's loss of consortium from $13,000,000.00 to

3   $5,000,000.00.  The reductions were made subject to Plaintiff's

4   acceptance of a remittitur on the grounds that the non-economic

5   damages were excessive under California law as the product of

6   "passion or prejudice."

7

8   B.   <u>THE *BUELL* DECISION</u>

9        *Buell* is instructive and helpful to evaluate the attack on

10  the jury's award of $20,000,000.00 in non-economic damages.  In

11  the *Buell* case, the Plaintiff suffered various injuries in a Ford

12  Explorer roll-over caused by a collapsing roof, which fractured

13  and severed the Plaintiff's spine at the T12 level where the

14  thoracic and lumbar regions meet and crushed her spinal sac and

15  leaked spinal fluid.  Plaintiff will never recover the sensation

16  or function below the level of the injury.  She suffered facial

17  injuries, fractured ribs, a cut spleen that caused internal

18  bleeding, a fractured leg and torn PCL and ACL ligaments in both

19  knees, causing bilateral knee dislocations.  In addition to

20  vertebral fractures, the spinal sac was damaged causing leaking

21  of cerebral spinal fluid and portions of the spinal cord and

22  nerve root were pulverized.  Doctors inserted metal screws and

23  rods into her back to stabilize her upper body.  After almost two

24  weeks, she was transferred to a rehabilitation center where she

25  spent another two and one-half months.

26       The Plaintiff's resulting paraplegia ended her active life,

27  forced her to re-learn, painfully, basic aspects of daily living,

28  some of which she will never regain.  She lives in constant and

**6**

severe pain that will increase over time.  She has no sensation
from the waist down, except phantom pain (a constant burning
sensation below her ribs).  Above her waist, she suffers constant
pain, feels painful pressure on her ribs from the rods in her
back, and has intermittent spasms of stabbing pain.

Medication can provide temporary relief, but the strong
medication needed has serious side effects.  It causes her to
lose alertness, makes it impossible to drive, interferes with her
ability to communicate socially, makes her unsteady in her
wheelchair; she runs the risk of becoming addicted to medication;
there is a constant conflict between efforts to reduce her pain
and the debilitating side effects of the medicine itself.

The spinal injury caused a total loss of bladder and bowel
control.  She must now catheterize herself multiple times daily.
Her feces must be manually extracted.  In addition to the
emotional pain and humiliation from losing control of her bodily
functions, she suffers recurring urinary tract infections, which
expose her to a potential fatal kidney disease.  She is allergic
to commonly prescribed medications including sulpha and
penicillin, and her chronic use of antibiotics to fight
infections has caused resistance to other drugs.

Plaintiff suffers severe bruising which takes months to heal
due to diminished circulation in her lower body.  Her feet swell
and are susceptible to cracking and bleeding.  The constant
grinding of her shoulder joints from wheeling her wheelchair has
caused shoulder problems, which will worsen over time.  She
suffers disfigurement with one leg smaller than the other and
large surgical scars across her back.

7

1    Before the accident Plaintiff was an active, athletic

2    outdoors woman, with a black belt in Martial Arts.  She often

3    camped and hiked with her family, backpacked with Girl and Boy

4    Scouts, helped with the San Diego tracking team, and did projects

5    at Missions Trails Regional Park.  She and her husband took

6    dancing lessons, traveled and took walks.

7    She no longer can engage in any of the active lifestyle she

8    once enjoyed, including swimming, skiing, snow boarding, dancing

9    back packing, and walking.  She was finishing her Masters Degree

10   in education and was about to start a second career as a teacher.

11   These plans have been indefinitely delayed and it is unclear

12   whether they are now possible.

13   Plaintiff is unable to visit all the rooms in her home,

14   including her own bedroom, because they are inaccessible to her.

15   She and her husband must sleep in their laundry room.  She has

16   changed from a giving, enthusiastic, independent person who took

17   joy in aiding others, to being dependent on others for almost

18   every aspect of her life.  Her husband and children are now her

19   caregivers.

20   Plaintiff no longer shares the physical relationship she had

21   prior to the accident.  Instead, her husband is now her caregiver

22   and must assist her with the most personal of care, including

23   showering and catheterizing her.  He assists in transferring her

24   in and out of her wheelchair and worries that she may fall if she

25   tries to transfer on her own.  Several times per night, he wakes

26   to turn his wife over in bed so that she will not get bed sores.

27   Her husband has had to decrease his work schedule as an

28   attorney to assist his wife during the day and accompany her to

**8**

medical appointments and therapy.  He performs the household work his wife can no longer do.  The couple spend most of their time trying to accomplish the mundane chores of daily life.  Every day her husband shares the Plaintiff's constant pain, frustration and anxiety in living with her injuries.

The *Buell* jury deliberated five days: found 9 to 3 the Explorer had stability design defects that were a substantial factor in causing the injuries; found 11 to 1 that there was a crash-worthiness design defect in the roof and that this defect was also a substantial factor in causing the injuries; as to the auto dealer: found 10 to 2 that the dealer failed to warn Plaintiffs of the stability defect; found in favor of Ford on failure to warn of the stability defect; found 10 to 2 that both Ford and the dealer failed to warn Plaintiffs of the crash-worthiness defect.

The *Buell* jury awarded Plaintiff $573,348.00 for past economic loss, $4,032,656.00 for future economic loss, $6,000,000.00 for past non-economic loss, and $99,000,000.00 for future non-economic loss.  Her husband was awarded $13,000,000.00 for loss of consortium.  The jury awarded $246,000,000.00 in punitive damages against Ford.

The original Trial Court decision addressing Ford's motion for new trial found excessive the compensatory damages awarded, but did not find the jury rendered its verdict due to passion or prejudice.  The Court conditionally granted a new trial unless Plaintiff's consented to a reduction of compensatory damages to $70,000,000.00, reduced the husband's loss of consortium award from $13,000,000.00 to $5,000,000.00, and reduced the punitive

1  damages award to $75,000,000.00.  Subtracting the jury's award of
2  economic damages in the amount of $4,606,004.00, the Court's
3  remittitur left Plaintiff with a net $65,393,996.00 award of non-
4  economic damages.

5      Certiorari was granted by the California Supreme Court,
6  which vacated the decision and remanded to the Court of Appeals
7  for further review of the damages awards.  The Court of Appeals
8  on remand found both the non-economic damages award of
9  approximately $65,000,000.00 to Plaintiff and the $75,000,000.00
10  award of punitive damages, as remitted by the Court, were still
11  excessive as a matter of law, the result of passion and
12  prejudice, and that substantial evidence in the case supported
13  further reductions of the total non-economic damages award to
14  $18,000,000.00 and the punitive damages award to $55,000,000.00.
15  The Court of Appeal did not find that Mrs. Buell-Wilson's non-
16  economic damages award violated due process principles.

17

18  C.   LAW RE EXCESSIVE NON-ECONOMIC DAMAGES

19      The grant or denial of a motion for new trial in a diversity
20  case is governed by Federal law.  *Donovan v. Penn Shipping Co.*,
21  429 U.S. 648, 649 (1977) ("the proper role of the trial and
22  appellate courts in the Federal system in reviewing the size of
23  jury verdicts, is . . . a matter of Federal law").

24      In this case, NAIS contends the jury's $15,000,000.00 award
25  for past non-economic damages for 26 months until date of the
26  trial is excessive and against the clear weight of the evidence.
27  NAIS does not specifically address the $5,000,000.00 award of
28  future non-economic damages.  NAIS complains the jury's

10

1  apportionment of responsibility is also against the clear weight

2  of the evidence.  *Economics Laboratory, Inc. v. Donnolo*, 612 F.2d

3  405, 410 (9th Cir. 1979).  However, "courts sitting in diversity

4  may look to state decisions for general guidance."  11 Charles

5  Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice

6  & Procedure: Civil 2d § 2802 (2d Ed. 1995), at p. 45.

8  D.   <u>NATURE OF BRIAN HALL'S INJURIES</u>

9     A review of the evidence shows the very substantial nature

10  of Brian Hall's injuries.  He suffered catastrophic burns.  Sixty

11  to sixty-five percent of his body was burned and twenty percent

12  more was used in grafting, meaning 85% of his body has been

13  involved in the burn injuries and healing.

14     Mr. Hall was hospitalized many times for a total of 8 1/2

15  months in the first 26 months following the burn injury.  He

16  nearly died in his first hospitalization and was on a respirator;

17  had spontaneous rupture of his bowel; required five laparotomies.

18  Mr. Hall was transferred to Harbor View Medical Center in

19  Seattle, Washington, for rehabilitation and more surgery.  He

20  returned to Fresno and was hospitalized in September 2006 to

21  reverse his illiostomy.

22     Mr. Hall then underwent a series of surgeries by a plastic

23  surgeon, Dr. Randy Galli.  After the first plastic surgery in

24  February 2007, Mr. Hall suffered a reversal requiring him to be

25  re-hospitalized.

26     Plaintiff next had major hernia surgery at Community

27  Regional Medical Center in April, 2007.  This was followed by

28  surgeries on his hands during the summer and fall of 2007.

1   Mr. Hall has had 27 surgeries so far.  More surgeries are

2  scheduled for his right hand and further surgeries may be

3  required for his neck and nose.

4   Mr. Hall has suffered extreme pain.  He has neurogenic pain

5  in his legs; easy fatigueability; inability to run or walk

6  distances; disfigurement to his face, hands and torso; permanent

7  losses of his skin.  He will suffer cosmetic losses to his hands.

8   Five doctors testified at trial to Plaintiff's extreme

9  emotional distress, anxiety, and psychological suffering.

10  Photographs were received in evidence that depict his extensive

11  burns, and the changes to his face, hands, and torso, resulting

12  from the burns and the surgeries that have followed.  Mr. and

13  Mrs. Hall testified about the impact of his burns on his social,

14  familial, and vocational life.  Plaintiff suffers inability to

15  sleep.  His wife has become his caregiver.  Mr. Hall's past

16  undisputed, paid medical bills total $1,085,961.00.  The jury

17  found a larger amount to be the reasonable value of his past

18  medical care.  Mr. Hall was 41 years of age at the time of the

19  accident.  He has a 35 year life expectancy.

20

21  E.  <u>PLAINTIFF'S ECONOMIC DAMAGES</u>.

22   In addition to $1,085,961.00 in stipulated past medical

23  expenses, the jury found that it is reasonably certain Mr. Hall

24  will require $2,123,800.00, after 5% reduction, in future medical

25  expenses at present value.  The jury found lost earnings in the

26  past of $200,913.00; Mr. Hall will not return to work.  The jury

27  awarded lost future earnings in the present value of

28  $1,886,847.00.  The total jury award for Mr. Hall's economic

1   damages before reductions and offsets was $7,264,746.20,

2   reflecting the amount of past medical bills submitted, which was

3   reduced by agreement, post-judgment, to $1,085,961.00.  This

4   represents a net recovery ratio of economic to non-economic

5   damages of 1:3.6, after reductions required by law reduce total

6   economic damages to $5,018,810.06.  Mrs. Hall's damage award is

7   not challenged.

8

9   F.   THE DEFENSE RE: NON-ECONOMIC DAMAGES

10       In closing argument, Plaintiff's counsel asked the jury to

11   award $20,000,000.00 to $40,000,000.00 for total damages.  The

12   defense chose not to discuss damages in argument, opting for an

13   all-or-nothing non-liability defense verdict, or 100% comparative

14   fault allocation to others than NAIS.

15       The non-economic damages instructions, Nos. 38 and 39,

16   specified that Plaintiff could recover compensation for physical

17   pain, mental suffering, loss of enjoyment of life, disfigurement,

18   physical impairment, inconvenience, grief, anxiety, humiliation,

19   and emotional distress.  There is no dispute, as Defendant

20   acknowledges, that, as a result of the catastrophic burn

21   injuries, Plaintiff has endured great pain and suffering from the

22   accident.  Non-economic damages do not consist of only emotional

23   distress and pain and suffering.  They include invasion of a

24   person's bodily integrity (i.e., the fact of the injury itself),

25   disfigurement, disability, impaired enjoyment of life,

26   susceptibility to future harm or injury, and shortened life

27   expectancy.  All of these harms were established by the evidence.

28   The non-economic damages suffered by Mr. Hall were substantial,

13

1  permanent, and support a very significant award.  His

2  disfigurement is visible and not fully correctable.  In the first

3  two years, he experienced ongoing pain and uncertainty about his

4  ability to function in the future.  He faces more surgery and his

5  pain, although reduced, continues into the future.

6       In *Buell*, the Court of Appeal found $65,000,000.00 in non-

7  economic damages was, despite the overwhelmingly debilitating and

8  disabling nature of Plaintiff's injuries, disproportionate to

9  those injuries so as to "raise a strong presumption that it is

10  based on prejudice or passion."  *Saari v. Jongordan Corp.* (1992)

11  5 Cal.App.4th 797, 807.  The *Buell* Court found that over a 33-

12  year life span, even accepting her catastrophic injuries, non-

13  economic damages of approximately $1,868,399.00 per year was an

14  "extremely high amount."  Ford's argument that a $1,000,000.00

15  award, working out to $28,571.00 per year, and only $78.00 per

16  day, was rejected because it did not fairly and justly compensate

17  the Plaintiff.  Here, the $15,000,000.00 award of past non-

18  economic damages for the 26 month period until the trial,

19  calculates to $19,000.00 per day or $6,928,406.40 per year.  The

20  future non-economic damages of $5,000,000.00 over a 35.2 year

21  life span, results in an annual award of $142,857.00.

22

23  G.   DEFENDANTS' NON-ECONOMIC DAMAGES CONTENTIONS

24       Defendants argue strenuously that Mr. Hall's testimony shows

25  that over the past two years, his pain has diminished; his

26  marriage has improved; he has regained considerable function with

27  his hands, is ambulating successfully, and performs a variety of

28  activities.  In November of 2006, Mr. Hall reported to a defense

1   physician that, on a scale of 1 to 10, his pain is at best a 2,

2   usually a 3-4, and at worst a 5.  Plaintiff can dress himself and

3   can cook.  He can walk about a mile every day.  He does household

4   chores.  He uses an elliptical machine for exercise.  He uses the

5   Internet on a computer.  He has been driving for more than a

6   year.  He drives the children to school 3 or 4 days a week, and

7   drove, alone, to and from Alameda, California, more than 300

8   miles, to participate in training exercises with the U.S. Naval

9   Reserve.  Mr. Hall attended Naval Reserve Training exercises

10  every month between June and September of 2007.  However, it is

11  questionable whether his active Reserve status will continue.

12       Mr. Hall believes he has coped well emotionally with his

13  accident.  He has not given up.  He does not have nightmares or

14  flashbacks of the accident, except when he hears a helicopter.

15  He has no fear of fire.  He hopes to return to work someday.  He

16  agrees marriage counseling has been helpful and his marriage is

17  improving.  He has a very good relationship with his children.

18  The Plaintiff's wife, Jean Hall, recognizes he has made

19  significant progress since the accident.  He drives himself to

20  his doctors' appointments.  Plaintiff can cook, wash dishes, do

21  laundry and maintain the pool.  Mrs. Hall describes the Plaintiff

22  as highly intelligent, very motivated, and very optimistic.  She

23  stated he has "a very good outlook on life."  Since the accident,

24  Mr. Hall has gained confidence and is doing more things that

25  interest him.

26       The defense refers to the Plaintiff's treating physicians

27  who testified that he has made improvement and good recovery over

28  the past two years.  Dr. Dominic, his burn surgeon, characterized

as "remarkable" the manner in which Plaintiff and his wife have dealt with his injuries.  Dr. Dominic testified Plaintiff has done as well as he has seen any patient do with these types of injuries.  Dr. Dominic also noted Plaintiff is resilient, has good cognitive abilities, and has not manifested signs of post-traumatic stress disorder.  Plaintiff's illiostomy was successfully reversed.  Plaintiff's hand functions have improved.  Dr. Galli testified that the surgeries to date on Plaintiff's hands have been successful.

Dr. Teague observed that since he first saw Plaintiff in November 2006, Plaintiff has become heavily involved in ham radio operations; developed some long-term relationships with these activities; was "more animated;" was "able to see his life is not over;" displays more energy; has a better affect and was "doing more enjoyable things."  By early 2007 Plaintiff was beginning "to feel more like his old self."  Dr. Teague opined that Plaintiff was "on top of the world" in June of 2007, when he began to train with the U.S. Naval Reserve in Alameda.  Plaintiff was "very well received" and felt "valued" by his fellow Naval Reservists.  There is some uncertainty about whether Plaintiff can continue drilling in the active Naval Reserve.

Dr. Teague finds that Plaintiff is tough and resilient; will do everything possible to improve his situation, and that the Halls' marital troubles were "abating" in large part because of their "very successful" counseling with Dr. Judith Knapp.

Defendants dispute Dr. Epperson's observation (the only one) that Plaintiff has exhibited signs of anoxic brain injury.  Any stress associated with the lawsuit, which was identified by

16

1  Plaintiff's marital counselor, Dr. Knapp, is not compensable.

2  *Ortega v. Pajaro Valley Unified Sch. Dist.* (1998) 64 Cal.App.4th

3  1023, 1060-61.  All mental health professionals evaluating the

4  marital relationship between Plaintiff and his wife agreed that

5  marital problems pre-existed the accident, particularly in 2001

6  and 2002; divorce had been discussed; the couple had a strained

7  relationship before the accident and Plaintiff's wife said on

8  more than one occasion that she planned to divorce him.  Both

9  Plaintiff and his wife testified their marriage has improved.

10      Defendant argues that the weight of the evidence at trial

11  demonstrates significant improvement in Plaintiff's physical

12  condition and mental outlook; that the marriage has "ups and

13  downs," but has been improving.  Defendant acknowledges Plaintiff

14  has endured a great deal of pain and suffering from the accident,

15  but asserts that $15,000,000.00 for pain and suffering during the

16  two year and two month period from the accident until trial is

17  "outrageous."

18

19  H.   THE LAW RE: SIZE OF THE AWARD

20      "The amount of damages is a fact question, first committed

21  to the discretion of the jury and next, to the discretion of the

22  trial judge on a motion for new trial."  "They see and hear the

23  witnesses frequently . . . see the injury and the impairment that

24  has resulted therefrom . . . ."  *Seffert v. Los Angeles Transit

25  Lines* (1961) 56 Cal.2d 498, 506-507.  The trial court's

26  determination is subject to the "more demanding test of weighing

27  existing evidence."  *Buell* *14; citing *Fortman v. Hemco, Inc.*

28  (1989) 211 Cal.App.3d 241, 259.

17

1    Under California law, there are no fixed or absolute

2  standards in reviewing a non-economic damage award at the

3  appellate level.  The Appellate Court has a duty to uphold the

4  jury and trial judge whenever possible.  *Buell* *15.  The amount

5  to be awarded is 'a matter on which there legitimately may be a

6  wide difference of opinion' [citation].  Injuries are seldom

7  identical in the amount of pain and suffering involved in similar

8  physical injuries varies widely.  These factors must be

9  considered.  *Seffert*, *supra*, 56 Cal.2d at p. 508.

10    The fact that an award may set a precedent by its size does

11  not in and of itself render it suspect.  The determination of the

12  jury can only be assessed by examination of the particular

13  circumstances involved.  *Rodriguez v. McDonnell Douglas Corp.*

14  (1978) 87 Cal.App.3d 626, 654-55.

15    "A reviewing court should not assume to substitute its

16  appraisal for that of a jury of the amount of damages for

17  physical pain and mental suffering sustained by a party where

18  trial by jury was had as a matter of right, but in a case where

19  it appears that a verdict is so grossly disproportionate to any

20  reasonable limit of compensation warranted by the facts as to

21  shock the sense of justice and raises at once a strong

22  presumption that it is based on prejudice or passion rather than

23  sober judgment," [citations] the court should intervene.  The

24  Appellate Court may reverse the judgment and remand the case for

25  a new trial either on all the issues or on the issue of damages

26  alone, [citations], or it may, in the interests of justice and

27  with the consent of the party against whom the modification is

28  made, modify the judgment as to the amount of damages, and affirm

18

1   it as modified [citations]." *Deevy v. Tassi* (1942) 21 Cal.2d
2   109, 120-21.

3

4   I.   <u>COMPARISON WITH OTHER AWARDS</u>

5        Defendants argue:  "A District Court should evaluate whether
6   damages are excessive 'by comparing the sum to other awards in
7   similar cases within the jurisdiction.'"  *Shaw v. United States*,
8   741 F.2d 1202, 1209 (9th Cir. 1984).  *Shaw* is a Federal tort
9   claims case in which the amount and excessiveness of damages is
10  controlled by the State law of the State where the tort occurred.
11  *Id.* at p. 1205.  The second case cited by Defendant, *Power v.*
12  *Union Pac. R. Co.*, 655 F.2d 1380, 1388 (9th Cir. 1981), is a
13  diversity case, that in addressing the issue of excessive damages
14  applied state law without any discussion about choice of law.
15  The Ninth Circuit in *Power* observed that the Defendant claimed
16  and the Appeals Court's research confirmed, that no Court in
17  Washington state had awarded a figure remotely approaching
18  $400,000.00 for the loss of love and companionship, which the
19  District Judge awarded, as the trier of fact.

20       Plaintiff has not argued that State law should not be
21  referenced in comparing verdicts from comparable cases.  In
22  *Seffert*, *supra*, 56 Cal.2d at p. 508, the California Supreme Court
23  reviewed California law:  "While the Appellate Court should
24  consider the amounts awarded in prior cases for similar injuries,
25  obviously, each case must be decided on its own facts and
26  circumstances.  Judgments awarding damages in other cases
27  reversed on appeal as excessive, do not in and of themselves
28  mandate reversal.  The vast variety of, and disparity between,

awards in other cases demonstrate that injuries can seldom be measured on the same scale.  For a reviewing Court to upset a jury's factual determination on the basis of what other juries awarded to other Plaintiffs for other injuries in other cases based upon different evidence constitutes a serious invasion into the realm of fact finding.  *See Buell-Wilson*, at p. 34, *citing, Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, n.12. *Buell* specifically observed a verdict is not excessive as a matter of law simply because it exceeds the amount awarded in other cases.

There, Ford cited five reported California decisions where non-economic damages for reportedly similar injuries ranged from $1,000,000.00 to $8,400,000.00.  However, in only two of the cited cases were the damages claimed to be excessive and in both cases, the damage awards were upheld.  *Buell*, p. 35.  The *Buell* court's review of all the cases cited showed a range between $1,000,000.00 and $66,000,000.00 in compensatory damages awards based on substantial differences in the facts of each case. Ultimately, *Buell* held the decision must be based on the unique evidence in the case before the court.

Here, Defendants cite unpublished cases involving burn injuries where past non-economic damages range from $1,200,000.00; $3,000,000.00; $1,000,000.00; $2,500,000.00; $2,000,000.00; $312,000.00; and additional burn cases reporting only total verdicts, without separate breakout of non-economic damages, involving awards of $3,738,995.00; $11,272,238.00; $3,115,622.00; $6,650,000.00; and $13,924,000.00 to one Plaintiff and $12,402,000.00 to the other Plaintiff.  Defendant argues that

1   these cases awarded non-economic damages in the range of
2   $1,000,000.00 to $3,000,000.00, making the disputed
3   $15,000,000.00 for past economic damages for 2.2 years "clearly
4   excessive."

5       By contrast, Plaintiff compares the ratios in the comparison
6   cases provided by Defendant that show economic to non-economic
7   damages as:  1:1, 1:5(-), 1:16(+), 1:3(+), 1:5(+), 5:1 (a ten
8   year old case), 1:14(+), 1:13.6(+); 1:20.5(+), 1:4.7(-), and
9   1:12.6(+).  Plaintiff's ratio is 1:3.6 in this case.

10      From this number-crunching, the Plaintiffs note that of the
11  11 cases, the highest amount for past medical expenses was
12  $700,000.00, slightly more than one-half of Brian Hall's past
13  medical expenses.  Ultimately, Plaintiff has cited *Buell*, before
14  the non-economic damages were reduced from $65,000,000.00 to
15  $18,000,000.00, to meet the range of a multiple of three to four
16  times the economic damages (specials).  In this case, the
17  economic damages net of workers' compensation offset, are
18  $5,509,662.00.  A three to four times ratio, not requested by
19  Plaintiff's counsel, would put non-economic damages in the range
20  of $15,500,000.00 to $22,000,000.00.  Plaintiffs argue that in
21  none of the comparison cases cited by Defendant, was an award of
22  non-economic damages found excessive.

23      Other than the gross amount awarded by the jury for non-
24  economic damages, other evidence should be considered to decide
25  whether the award was motivated by passion or prejudice.  Here,
26  the jury awarded in the low end of the range suggested by
27  Plaintiff's argument for total damages in the case ($7,000,000.00
28  above the $20,000,000.00 low end).  The jury did not award the

full amount of future medical expenses requested.  The jury
awarded only $250,000 to Mrs. Hall for loss of consortium, all of
which reflects considered and deliberate decision-making on the
value of her claim and a recognition of prior problems in the
marital relationship unrelated to the burn injuries.  Plaintiffs'
counsel's argument to the jury was that the award should consider
past and future physical pain, mental suffering, loss of
enjoyment of life, disfigurement, loss of quality of life, the
mental upset associated with future surgeries.  Counsel did not
suggest a multiple to be applied to the special (compensatory)
damages to be awarded.

As in *Buell*, defense counsel here did not discuss the amount
of damages in closing argument.  As he admits, defense counsel
requested an all-or-nothing liability defense verdict or a
finding of 100% contributory fault.  In *Buell*, where the jury
originally awarded 23 times more non-economic than economic
damages and more than 7.6 to 5.6 times specials for total damages
in the range that Plaintiff's counsel there argued was "fair,
just and reasonable."  The initially remitted amount of
$65,000,000.00, was still a 1:14 ratio of economic to non-
economic damages.  The size of the original award provided
compelling evidence that the jury ignored what the Plaintiffs'
counsel believed was fair and reasonable, i.e., $13,800,000.00
(1:3) to $18,400,000.00 (1:4), constituting awards which arose
from passion or prejudice and were to punish Ford.  In *Buell,* the
husband's loss of consortium award of $13,000,000.00 was three
times the amount counsel had requested in argument.  The fact
that the jury's awards far exceeded and had no relation to the

1  amounts requested by counsel suggested the jury did not act as a
2  fair and neutral trier of fact in fixing the amounts of damages.

3        Considering the totality of the record here, including but
4  not limited to the nature and extent of Mr. Hall's injuries, his
5  testimony, the testimony of lay and expert witnesses on damages,
6  both Plaintiffs' and defense's, the amount of the economic and
7  total damage awards, all inferences that can be drawn from the
8  evidence, and comparable awards in comparable cases, an objective
9  review of the record reveals non-economic award for
10 $15,000,000.00 past non-economic damages for 26 months was
11 grossly excessive if not monstrous.  Whether the award resulted
12 from passion or prejudice is a closer question.  The corporate
13 persona of NAIS, a large out-of-state energy conglomerate pitted
14 against an extremely likeable local Plaintiff raises the
15 likelihood that the very large verdict (the largest in the
16 history of the Eastern District of California), was the result of
17 such unlawful considerations.  As in *Buell*, here the non-economic
18 damage award, totaling $20,000,000.00, far exceeds any non-
19 economic damages award previously upheld by a California court.
20 The *Buell* Court referred to the remitted $18,000,000.00 non-
21 economic damage award as proportionate to the Plaintiff's
22 substantial injuries and proportionate to the economic damages
23 award.  *Citing, Duarte v. Zachariah* (1994) 22 Cal.App.4th 1652,
24 1665.

25        Although it is a very difficult comparison to make, it
26 cannot be said in this case that Mr. Hall's catastrophic injuries
27 are more severe than the horrendous injuries suffered and bleak
28 future faced by the Plaintiff in the *Buell* case.

                                   23

1    J.    <u>REMITTITUR</u>

2          The Court has authority, if non-economic damages are against

3    the clear weight of the evidence or determined to be a product of

4    passion or prejudice, to issue a remittitur, rather than an

5    outright grant of a new trial on all issues.  *Deevy v. Tassi*

6    (1942) 21 Cal.2d 109, 120-21.  When a district court, after

7    viewing the evidence in the light most favorable to the

8    prevailing party, concludes that a damage award is excessive, it

9    must grant a new trial on damages unless the prevailing party

10   accepts a remittitur which the court considers justified.  *Fenner*

11   *v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir.

12   1983).

13         "A new trial is not required even when there is an excessive

14   damages award resulting from passion and prejudice, unless there

15   is also evidence that passion and prejudice affected the

16   liability finding."  *Witec Co., Ltd. v. Liu*, 403 F.3d 645, 655

17   (9th Cir. 2005).  In such a case, remittitur is an appropriate

18   method of reducing excessive verdicts, although the court still

19   retains the option of vacating the judgment and ordering a new

20   trial.  *Witec* at p. 655, *citing, Seymour v. Summa Vista Cinema,*

21   *Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987).

22         Here, based on the totality of the evidence, severity of the

23   injuries and applying a 1:3 to 1:4 ratio for economic to non-

24   economic damages, the non-economic damages should be remitted to

25   $13,333,333.00, what nets to an award of $10,000,000.00 for non-

26   economic damages after the 23% reductions, allocated

27   $6,000,000.00 to past economic damages and $4,000,000.00 to

28   future non-economic damages in fair and just compensation for

24

1  Plaintiff.

2      No other valid basis for new trial exists as is discussed in
3  the following section concerning the allocation of fault.
4  Defendant's motion for judgment as a matter of law on strict
5  liability, the only other remotely colorable issue raised pos-
6  trial, has been rejected on the merits.  Based on comparable
7  awards, the full extent of Plaintiff's injuries, his past
8  suffering, convalescence, and progress, the $20,000,000.00 non-
9  economic damage award is excessive and against the clear weight
10 of the evidence.  The court is firmly convinced the jury's award
11 is a mistake.  It is just to remit the award of past and future
12 non-economic damages to a net of $10,000,000.00.  All other
13 aspects of the judgment entered on the jury's verdict shall
14 remain in effect, conditioned on Plaintiff's acceptance of this
15 reduced amount.  If Brian Hall does not agree to the reduced
16 amount of past and future non-economic damages, that net total
17 award will be reversed and remanded for a new trial, solely on
18 the issue of the amount of past and future non-economic damages.

19

20 K.   NO FEDERAL DUE PROCESS ISSUE

21     The award and amount of compensatory damages do not raise a
22 federal due process issue, because they are distinguished from
23 punitive damages as not punitive.  Non-economic damages are not a
24 punishment, to deter conduct, but rather compensation to make a
25 Plaintiff whole.  As a result of a Defendant's conduct: "'[O]nce
26 the cause and existence of damages have been . . . established
27 [with reasonable certainty], recovery will not be denied because
28 the damages are difficult of ascertainment . . . .  The law only

                                25

requires that the best evidence be adduced of which the nature of
the case is capable[,] and the defendant whose wrongful act gave
rise to the injury, will not be heard to complain that the amount
thereof cannot be determined with mathematical precision.'" *Buell*
at p. 44; *citing, Dallman Co. v. Southern Heater Co.* (1968) 262
Cal.App.2d 582, 594; *Speegle v. Board of Fire Underwriters* (1946)
29 Cal.2d 34, 46 (placing the risk of uncertainty in fixing
damages on the wrongdoer).

*Buell* recognized that nothing is better settled than the
principle that in actions for torts, where no precise rule of law
fixes the recoverable damages, the jury's peculiar function is to
determine the amount. *Buell* specifically held that an excessive
non-economic damages award, as distinguished from punitive
damages, does not raise a federal due process issue: "We are
loath to usurp this core function of the jury by relying on
quasi-mathematical formulas to assess the amount of damages that
may be awarded, simply because non-economic damages are not
readily quantifiable."

The risk that juries would use compensatory damages to
punish instead of compensate does not require imposing due
process limitations on such awards, where the jury is instructed
that it must not let bias, sympathy or prejudice influence their
decision. *Buell* at p. 45. Here, the jury was instructed that it
must use its collective judgment to decide a reasonable amount
based on the evidence and common sense. Moreover, any award for
future damages had to be proved with reasonable certainty that
the harm would be suffered in the future. By categorizing each
type of harm for which recovery could be awarded, the jury was

given guidance to avoid their making a compensatory damage award to punish the defendant.

Where a jury's award of non-economic damages is challenged as excessive, the judge must review the evidence and has the discretion to issue a remittitur when there is substantial conflict in the evidence regarding the extent of damages.  *Buell* at p. 45; *citing Hughes v. Hearst Publications, Inc.* (1947) 79 Cal.App.2d 703, 705.  This rule provides a further check against excessive awards of non-economic damages.  Although more recent cases recognize that awards for emotional distress in some instances have a punitive element; *Buell* at p. 45, *citing, Gober v. Ralph's Grocery Co.* (2006) 137 Cal.App.4th 204, 223; there is no error where the award is within the range for similar cases and is proportionate to the Plaintiff's substantial injuries and economic loss.  *Buell* concluded it is not necessary to impose federal due process principles to limit non-economic damage awards, because:  (1) the Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) imposed due process limits on punitive damage awards as they are similar to criminal penalties, without protections afforded Defendants in criminal proceedings, while non-economic damages are designed to compensate, not punish; (2) in civil cases Defendants have adequate notice of potential awards; and (3) the review accorded damage awards by trial and Appellate Courts ensures there is no punitive element in non-economic damage awards.  In this case, a $20,000,000.00 non-economic damages award, almost four times economic damages, has punitive effect.

**L.     ALLOCATION OF COMPARATIVE FAULT - REVIEW STANDARD**

Defendant argues that the jury's apportionment of
responsibility among Plaintiff, his employer AES Mendota LP
("AES"), and Defendant NAIS, the blaster, is against the clear
weight of the evidence and mistaken.  The allocation of fault is
a matter subject to review on a motion for new trial.  *See
generally, Kalland v. North American Van Lines*, 716 F.2d 570,
573-74 (9th Cir. 1983); *Newby v. F/V Kristen Gail*, 937 F.2d 1439,
1442-43 (9th Cir. 1991) (reviewing allocation of fault in
admiralty case under the doctrine of comparative negligence); *see
also, Trinidad Corp. v. SS Keiyoh Maru*, 845 F.2d 818, 822 (9th
Cir. 1988) (recognizing apportionment of fault in admiralty cases
under comparative negligence principles is subject to review).
Under California law, a Court may not use a remittitur to
apportion liability; rather it must grant a new trial if the
apportionment of fault is not supported by the weight of the
evidence.  *Schelbauer v. Butler Mfg. Co.* (1984) 35 Cal.3d 442,
452-55.

There is no verbal formula or unerring litmus test to
apportion fault for a particular case.  *Landes Constr. Co.,
infra*, at p. 1377.  The trial court, in ruling on such a motion,
has "the duty . . . to weigh the evidence as [the Court] saw it,
and to set aside the verdict of the jury, even though supported
by substantial evidence where, in [the Court's] conscientious
opinion, the verdict is contrary to the clear weight of the
evidence."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th
Cir. 2007) (the judge can weigh the evidence and assess the
credibility of witnesses, and need not view the evidence from the

28

1   perspective most favorable to the prevailing party); *Shimko v.*
2   *Guenther*, 505 F.3d 987, 993 (9th Cir. 2007). "Substantial
3   evidence is such relevant evidence as reasonable minds might
4   accept as adequate to support a conclusion even if it is possible
5   to draw two inconsistent conclusions from the evidence. *Landes*
6   *Constr. Co.*, at p. 1371.

7        "A decent respect for the collective wisdom of the jury and
8   for the function entrusted to it in our system, suggests that in
9   most cases the Judge should accept the findings of the jury.
10  Doubts about the correctness of a verdict are not sufficient
11  grounds for a new trial. *Landes* at p. 1371-72. If, having given
12  full respect to the jury's findings, the Judge on the entire
13  evidence is left with a definite and firm conviction that a
14  mistake has been committed, it is to be expected that a new trial
15  will be granted. *Landes Constr. Co. v. Royal Bank of Canada*, 833
16  F.2d 1365, 1372 (9th Cir. 1987) (the trial judge does not sit to
17  approve miscarriages of justice).

18

19  M.    ALLOCATION OF FAULT

20        The jury allocated fault 75% to Defendant NAIS, 20% to the
21  employer AES, and 5% to the Plaintiff, Brian Hall. Defendant
22  argues that AES's responsibility is at lest equal to, if not
23  greater than, that of NAIS. Defendant argues that Plaintiff was
24  appointed safety director, although he lacked prior safety
25  experience or training. Mr. Wrighthouse, Plaintiff's supervisor,
26  suggested that the decision to make Plaintiff safety director was
27  a bad idea. Mr. Wrighthouse testified that Plaintiff had "fallen
28  behind" in his safety management responsibilities. Plaintiff's

1   expert, Clair Austin, opined that Plaintiff was not qualified to
2   be safety director as the AES Mendota cogeneration plant.

3       Defendant complains that although AES required its own
4   employees to fight small fires at the plant, AES employees were
5   not trained in firefighting.  Plaintiff's expert opined that to
6   engage in firefighting, a firm must:  (1) form a firefighting
7   brigade; (2) train employees in firefighting; and (3) provide
8   employees with firefighting protective equipment.

9       Ms. Austin further opined that the employer shared
10  responsibility for managing the safety of the deslagging
11  operation with AES.  The jury was so instructed that safety
12  regulations, laws, and industry customs or practices applied
13  equally to the employer and NAIS.  Jury Instructions No. 24, 25.

14      Defendant points to the Austin opinion that both the
15  employer and NAIS were responsible for adequate pre-blast
16  planning.  Plaintiff's fire expert, Joe Romig, opined that the
17  grating over the chute near the mid-level cyclone door did not
18  function properly on the day of the accident.  NAIS blaster,
19  Shawn Sicard, warned AES employees in a pre-blast safety meeting
20  that plywood surrounding the cyclone's mid-level door would
21  ignite after the blast.  The plywood was not removed, nor did Mr.
22  Sicard object or refuse to proceed with the explosive deslagging
23  job.

24      AES did not prepare a Job Safety Analysis for the deslagging
25  operation on the day of the accident.  This was a breach of its
26  duty of care to competently manage its cogeneration plant.

27      Defendant criticizes AES's post-blast fire suppression
28  efforts.  AES prohibited NAIS from fighting any fires on the

1   premises.  The only persons who participated in fire suppression

2   efforts were untrained AES employees.  Ms. Austin opined that AES

3   should have contacted the Fire Department to handle large fires

4   and recognized AES prohibited NAIS from fighting fires on site

5   and prohibited its own employees from fighting fires, except

6   small fires.  It is undisputed that AES employee, Mark Holbrook,

7   sent away the Fresno County Fire Department fire engine that

8   arrived shortly after the initial fires on the tower.

9       The Defendant further relies on its fire expert, Kimball

10  Clark, who testified that as a power plant operator, AES could

11  have controlled the air-fuel ratio in the boiler and could have

12  determined whether there was a build-up of unburned fuel in the

13  cyclone.  AES should have advised the blaster about unburned fuel

14  in the cyclone.  Although Defendant claims AES should have

15  advised about the risks associated with any unburned fuel

16  condition, NAIS, as a blaster, and Mr. Sicard, who was specially

17  licensed for explosive deslagging, should have been aware of and

18  addressed these risks.  Nor does the Defendant acknowledge that

19  with its experience in deslagging, NAIS should have been aware of

20  all of the risks associated with explosive deslagging, including

21  the risk of fireballs from unburned fuel.

22      Mr. Clark opined that the second fireball that burned the

23  Plaintiff was caused by unburned fuel that ignited and burned

24  after deslagging opened an air passage which facilitated

25  ignition.  The ignition was, in Clark's opinion, caused in part

26  by AES's personnel spraying water through the cyclone door into

27  the boiler.  Defendant argues strenuously that the apportionment

28  of fault between NAIS and the employer should be equal.

1  **N.**   <u>**FAULT OF PLAINTIFF**</u>

2       Defendant argues for a greater allocation of fault to

3  Plaintiff based on his lack of qualifications to serve as safety

4  director at the plant.  Plaintiff was responsible for compliance

5  with OSHA regulations and AES safety procedures in managing the

6  plant's safety program.  Mr. Hall testified he had some

7  misgivings about assuming the safety director job and felt he was

8  not qualified.  Mr. Hall nonetheless studied and expended

9  substantial work effort to gain qualifications as safety

10  director.

11       Mr. Hall admitted that he had trained other AES employees in

12  the use of appropriate protective equipment, that his short-

13  sleeve synthetic fabric shirt was flammable; and he should not

14  have been fighting fires on the day of the accident.

15       The evidence did not establish that Mr. Hall planned to

16  fight any fires on the date of the accident.  He voluntarily

17  ascended the tower to watch the blast.  Mr. Hall was curious and

18  felt some responsibility, as safety director, to be present on

19  the tower during the blast.  Mr. Hall conceded it was a voluntary

20  choice on his part, that he was not required to be there.

21  Plaintiff's blasting expert, Rod Hall, opined that Plaintiff

22  exercised poor judgment in wearing a polyester shirt and for

23  standing one level above the mid-level cyclone during blasting

24  operations.  Rod Hall was impeached by his deposition testimony.

25       NAIS and Mr. Sicard did nothing to prevent Plaintiff, or any

26  other AES employee, from being present on the tower in the blast

27  area and did not order Plaintiff or any AES employee to leave the

28  tower during blasting and its expected aftermath.

O.   **PLAINTIFF'S RESPONSE RE: FAULT ALLOCATION**

Plaintiff notes that NAIS was a licensed blaster, not AES. NAIS had extensive experience with explosive deglagging of boilers.  Shawn Sicard's blaster's license included the specialty of boiler deslagging.  AES had no experience conducting blasting operations.  The only AES deslagging experience was to use a pole to loosen slag deposits in cyclones.

NAIS had experience with blasting inside cyclones that included outflow of lava lasting thirty minutes to an hour after the explosion.  NAIS had specific knowledge that blasting was regulated by Federal, State and local laws, because it is inherently dangerous and an ultrahazardous activity.  California law (Title 8, California Code of Regulations; Jury Instruction No. 25), governing blasting requires a licensed blaster to be "competent," which includes having the ability to identify all hazards and to take prompt corrective measures to eliminate such hazards.  A licensed blaster is subject to minimum safety standards which include:  (1) establishing a blast area; (2) putting in place a system of signals to ensure the exclusion of everyone not needed and authorized from the zone of danger.  Jury Instructions No. 25 and 26.  The evidence supports a jury finding that the entire tower was the zone of danger.

The NAIS operating manual required strict adherence by NAIS personnel to all legal requirements governing blasting.  Mr. Sicard, who was not called as a witness at trial, came to the site without any pre-preparation for the AES job.  There is no evidence that he formulated any plan nor that he identified or acted to eliminate hazards to persons and property that were

33

1   likely to be encountered at the AES deslagging operation.

2      There is no evidence that Mr. Sicard investigated the

3   condition of the cyclone or the amount of slag and other

4   accumulation in the boiler.  Although Mr. Sicard warned AES that

5   plywood would burn and that AES should be aware of that risk, Mr.

6   Sicard took no steps to reduce or minimize the risk of burning

7   plywood, nor did he direct AES to do so.  All parties knew the

8   plywood was on the surface platform to keep the slag from

9   overflowing.  NAIS used a one page form referred to as a Job

10   Situs Analysis with brief handwritten additions.  NAIS inquired

11   if AES was prepared to handle hot slag.  After an AES

12   representative told Mr. Sicard that AES expected the slag to fall

13   through the grizzly and downchute, no further attention was

14   focused on slag overflow.

15      On the date of the explosive deslagging, Mr. Sicard

16   proceeded without a minimum five person crew, required by

17   industry custom and practice and NAIS's own policy.  NAIS sent

18   only two employees who accompanied Mr. Sicard, one of whom was

19   dispatched off-site during the blast.  The NAIS people were not

20   in PPE clothing.  NAIS did not instruct AES employees to wear PPE

21   clothing or to have PPE equipment for firefighting.  No

22   representative of NAIS or AES possessed any tools or other

23   equipment for and made no preparations for firefighting.

24      State law requires the blaster to establish a blast area.

25   Jury Instruction No. 25.  NAIS' manual required establishment of

26   a blast area for boiler deslagging.  Placement of barricade tape

27   was adjusted by NAIS beyond the NAIS manual's minimum area of one

28   level above and one level below the blast level.  The lower limit

1   of the tape was extended to the bottom of the stairwell.  No tape
2   was placed above, and as Plaintiff argues, this effectively made
3   the whole stairwell within the blast area.  It follows that NAIS
4   should have kept everyone off the tower during the blasting
5   operations, which were expected to last at least an hour or more.
6   Plaintiff notes that the video in evidence taken September 23,
7   shows the fireball engulfed the entire cyclone structure and
8   tower.

9        NAIS did not order AES people to stay off the stairwell
10  (blast site).  Evidence shows that AES personnel, including
11  Plaintiff, remained on the tower stairs and moved freely before,
12  during and after the blast.  Dave Sampson, the AES control room
13  operator, had nothing else to do and was curious to watch the
14  blast and positioned himself on the tower.  Plaintiff, as safety
15  manager, decided it would be a good idea to familiarize himself
16  with blasting, a potentially hazardous activity new to the plant,
17  and also positioned himself on the tower stairs, one level above
18  the mid-level cyclone from which the blast emanated.

19       California law provides that a blaster is prohibited from
20  bringing more explosives than necessary to complete the job.
21  NAIS personnel came on the structure with 15 explosive sticks,
22  evidencing the expectation that additional blasting would occur
23  after the first blast.  The law also provides that the blaster is
24  not to permit any explosives to be positioned where they could
25  come in contact with the blast, yet the blasting sticks and caps
26  were left on the tower during and after the blast.  From all
27  these facts, and Plaintiff's expert opinions, the jury had
28  substantial evidence to find that NAIS and Mr. Sicard ran a

1    sloppy operation, failed to control the blast area, and enhanced,

2    rather than reduced, the hazards of blasting on September 23, all

3    of which caused Plaintiff's burns.

4        After the first blast was set off by NAIS, a fireball

5    engulfed the structure.  Plant property, including the plywood on

6    the mid-level platform, caught fire.  The grizzly was plugged up,

7    exacerbating the build-up and free flow of molten slag on the

8    service platform and over its edges.

9        At that time, under the law, NAIS, through Mr. Sicard, was

10   in charge of and had responsibility for the blast area, the whole

11   tower.  NAIS had only two other employees present.  Neither was

12   prepared to nor had any apparent means of engaging in

13   firefighting.  Mr. Sicard issued no orders or directions to

14   anyone present at the blast site at any time during or after the

15   blasting operations.

16       Mr. Sicard and one of his assistants initially, briefly

17   assisted AES's emergency firefighting, and then moved to safety

18   before the second fireball.

19       In the same manner consistent with NAIS's prior experience

20   in its explosive deslagging at a Woodland cyclone, molten slag

21   continued flowing from the mid-level cyclone for over thirty

22   minutes following the blast.  AES continued with efforts to stop

23   heat and fire damage to the plant.  NAIS stood by and observed,

24   without comment, warning, or taking any action.

25       During the aftermath of the first blast, with application of

26   water through hoses to the mid-level cyclone door, a second large

27   fireball engulfed the structure and burned Plaintiff and others

28   on the tower.  The call for emergency assistance for Plaintiff

1  was made 61 minutes following the recorded time of the original

2  blast.  NAIS' contention that the second fireball was a separate,

3  unrelated event, not causally connected to the first blast, is

4  belied by NAIS's expectation that the first blast would continue

5  to produce molten slag (lava) and that additional measures,

6  including more blasting, might be required to successfully

7  complete deslagging.  NAIS knew deslagging could continue for

8  thirty minutes to an hour.  NAIS knew that it was legally

9  responsible for the blast area and abdicated its responsibility

10  to reduce and contain the known hazards of blasting.

11      Neither Mr. Sicard, the licensed blaster on site, or Mr.

12  McConihay, the NAIS safety officer, were called by Defendants as

13  trial witnesses.  NAIS did not address the issues of its

14  responsibilities for the blasting operation under the law in the

15  presence of the jury at trial, nor its planning, management,

16  implementation, and safety measures, including management of the

17  blast site.  Instead, as argued by Plaintiff, NAIS in effect,

18  abandoned the blast area to AES and blamed AES and the Plaintiff

19  100% for the second fireball and Plaintiff's injury.

20      A separate finding was made by the jury as to strict

21  liability, which permits liability without the express breaches

22  of duty and failure to adhere to legal and/or industry standards

23  for safety measures required in explosive deslagging operations.

24

25  P.    JUSTIFICATION FOR FAULT ALLOCATIONS

26      Plaintiff rejoins that as safety director, Plaintiff had no

27  capability to assess, to formulate, or to pre-approve the plan of

28  a licensed blaster for boiler deslagging that is why NAIS was

1    hired and paid.  Under the California Labor Code and a relevant

2    OSHA safety order, in employing the services of a licensed

3    blaster, it is not the Plaintiff who was qualified as a

4    "competent person" to supervise the blaster, but rather, the

5    blaster must be the competent person who supervises the blasting

6    operation.  No legal authority was offered by NAIS that AES's

7    safety director had any responsibility to direct, pre-approve, or

8    control a licensed blaster or the explosive deslagging

9    operations.

10        When Mr. Sicard saw that AES was unprepared to engage in

11   firefighting activities, that plywood was on and surrounding the

12   platform, and that AES safety policy prescribed that AES maintain

13   "control" over the blast site, Mr. Sicard and NAIS, reasonably,

14   should have objected and advised AES that it was NAIS's legal

15   responsibility under the law to operate and control the blast

16   site and to provide and implement a plan for safe blasting

17   operation.  NAIS should have reasonably known that AES's "policy"

18   of asserting control over the blast site would prevent NAIS from

19   discharging its statutory responsibilities.  Substantial evidence

20   supported a jury finding that NAIS, under the conditions proved

21   by the evidence, should not have proceeded with any blasting

22   operation at the AES Mendota plant until a prudent and lawful

23   blasting plan was in place and NAIS resolved the issue that it

24   was required to control the blast site during blasting

25   operations, including the approximately thirty minutes to one

26   hour that the effects of blasting continue, while the blaster

27   remained on site.  Dr. Austin, Plaintiff's safety expert,

28   testified that the risk of the AES Mendota plant explosive

1    deslagging job was simply too great and that NAIS should not have

2    permitted blasting to go forward.

3        Defendants' argument that AES and Mr. Hall were not trained

4    in firefighting and not prepared to engage in firefighting

5    activities does not change the allocation of fault.  Here,

6    neither AES nor Plaintiff had any background or experience to

7    know whether and to what extent firefighting activities would be

8    required.  No AES employee testified that AES expected to engage

9    in firefighting, had the equipment to engage in the full range of

10   firefighting that explosive deslagging required, or that

11   Plaintiff in any way recognized the need for or was prepared to

12   engage in firefighting activities.  Because the need for

13   firefighting was occasioned by the blast during NAIS's blasting

14   operations, it was the responsibility of NAIS to anticipate, plan

15   for, control, and effectively deal with the need for

16   firefighting.  The evidence fully supports the jury's finding

17   that NAIS had the predominant share of fault for not doing so.

18       Plaintiff's blasting expert, Rod Hall, testified that his

19   firm does not do "hot work" (blasting) because of the great risk

20   associated with explosive deslagging.  Mr. Hall opined that Mr.

21   Sicard failed to secure the area, violated the fifty foot radius

22   rule for blasting, by permitting Plaintiff's presence one level

23   above the mid-level cyclone door, and further testified that

24   contract blasting is recognized as an ultrahazardous occupation

25   within the blasting industry.

26       Rod Hall further opined that a five person crew was

27   necessary for this job, not one blaster with two assistants as

28   NAIS provided.  He further opined that Mr. Sicard, the blaster,

1   as supervisor in charge, exhibited poor judgment and failed to
2   keep everyone at the site out of harm's way.

3       Plaintiff's expert, Joe Romig, Ph.D., opined that a
4   deslagging operation demands the highest standard of care from
5   those in charge.  For the reasons stated above, NAIS's breaches
6   of duty were unquestionably the predominant and efficient cause
7   of Plaintiff's injuries, as found by the jury.

8       The evidence showed that the AES grating and chute did not
9   work properly.  The "grizzly" or grating was to prevent access to
10  the down-chute by a person or sizeable object.  The grating
11  apparently was plugged and/or undersized and did not function
12  effectively to remove molten slag as it exited the mid-level
13  cyclone.  Defendant offered the possibility that the grating was
14  not correctly designed for use in explosive deslagging, the jury
15  did not accept the argument or assign fault to the absent grating
16  and down-chute designer.  Moreover, there is no causative
17  connection between obstruction of the molten slag and the second
18  fireball that engulfed and injured Plaintiff.  No evidence was
19  adduced that igniting of unburned fuel was in any way caused by
20  the exit rate or volume of molten slag from the mid-level
21  cyclone.

22      The circumstances of the plywood are the same.  Mr. Sicard
23  warned about the plywood then did nothing about it; i.e., did not
24  demand that it be removed or condition NAIS going forward with
25  blasting on AES's removal of the plywood.  Further, there is no
26  explanation how removal of the plywood would have prevented the
27  ignition of unburned slag inside the boiler, or would have
28  avoided the second fireball that engulfed the Plaintiff.

1    Defendant criticized AES for not preparing a Job Site

2  Analysis for the day of the accident, however, AES had a Job Site

3  Analysis prepared a month earlier for deslagging at the Mendota

4  plant.  In view of AES's interaction with NAIS in the pre-blast

5  safety meeting and NAIS's failure to call off the explosive

6  deslagging until it could assure that a safe blasting plan could

7  be implemented, there is an absence of proof that the lack of a

8  JSA by AES caused the second fireball and Plaintiff's injuries.

9  This was a jury issue.

10    As to the subject of firefighting, Plaintiff points to the

11  NAIS County permit to operate as a blaster, which specified its

12  responsibility for firefighting.  Armed with active knowledge

13  that AES purported to assert control over the blast site, and

14  firefighting during "the blasting," operation which would

15  continue at least an hour in duration, NAIS should not have

16  proceeded with the job.  Nor did NAIS offer any explanation why

17  it should not have insisted that the Fire Department be notified

18  or that there be a stand-by competent firefighting force in

19  place.  NAIS had only two assistants present with Mr. Sicard;

20  none of whom were prepared for firefighting.  When the Fire

21  Department did respond to the scene, at the time it was sent away

22  by the AES representative who testified it did not appear there

23  was a need for the County Fire Department to engage in fire

24  suppression efforts; NAIS's blaster was on-site, observed the

25  existing conditions and said nothing.  Particularly, Mr. Sicard

26  failed to object and failed to request that the Fire Department

27  remain on site.

28    As to unburned fuel in the cyclone, the evidence is

41

1   unrebutted that NAIS, knowing of that specific risk, did no

2   advance investigation, made no inquiry into or evaluation of what

3   the condition of the cyclone was, or whether the cyclone

4   contained unburned fuel.  Nor did any NAIS witness address this

5   issue at trial.  Only the argument of counsel was presented,

6   inviting the jury to speculate that it was AES's responsibility

7   to evaluate and accommodate the risk of unburned fuel.

8

9   Q.   <u>ALLOCATION OF FAULT TO BRIAN HALL</u>

10       Defendant has argued that Brian Hall should have

11  substantially greater fault than 5% because he accepted the

12  position of Safety Director, wore a polyester shirt the day of

13  the accident, and had inadequate firefighting gear on site.  No

14  evidence was adduced that any Safety Director for AES has ever

15  been trained in or was knowledgeable about explosive deslagging

16  and blasting operations.  Rather, the evidence was that AES has

17  always hired a licensed blaster to perform explosive deslagging

18  in accordance with law.  No evidence was adduced that the Safety

19  Director at the AES Mendota plant had any role in prior

20  deslagging blasting operations for, under the law, that

21  responsibility lies with the licensed blaster, NAIS.

22       Other than argument, there was no evidence of custom,

23  practice, AES rule or policy that Safety Directors were to dress

24  in fire protective equipment or to engage in firefighting, other

25  than "small fires" during explosive deslagging.  There is no

26  evidence that Plaintiff, as Safety Director, was to have or

27  legally could have had any role whatsoever in the NAIS explosive

28  deslagging operation.  In view of the size, intensity, and

42

1    duration of the second fireball, the evidence does not support a
2    finding that Plaintiff's burns on his hands, arms, and face,
3    could have been less severe if he had worn PPE clothing.

4        Based on the totality of the evidence of the allocation of
5    fault respectively applied to the explosive deslagging, NAIS
6    (75%), AES (20%), Plaintiff (5%) is not against the clear weight
7    of the evidence, nor does it support the conclusion that the jury
8    was clearly mistaken in its allocation of comparative fault.

9

10                            CONCLUSION

11       As the standards for new trial have long existed, the trial
12   judge, in ruling on such a motion, must consider all the evidence
13   and must be mindful of and pay respect to the role and function
14   of the jury.  The Court believes in the jury system and the work
15   of the jury in this case.  The jurors were sincere, attentive and
16   conscientious.  They worked diligently for three days in reaching
17   their verdicts after almost 20 days of trial.  The case was tried
18   by attorneys of the highest competence, who collectively
19   possessed well over 100 years of experience as trial lawyers and
20   all of whom did outstanding work in their presentations and trial
21   of the case.  The case could not have been better tried.  In the
22   final analysis, on the allocation of fault, Defendant made
23   informed, strategic choices:  (1) not to call as trial witness,
24   Mr. Sicard, the blaster, or McConihay, Director of Safety
25   Operations for NAIS; (2) to deny any liability whatsoever; (3) to
26   attempt to shift 100% fault to AES and Mr. Hall; (4) not to
27   specifically address a licensed blaster's statutory duties to
28   pre-plan, to establish a blast area, to control, and to ensure

                              43

1  the overall safety of its blasting operation and the blast site,
2  and (5) to not discuss damages or offer the jury bases to
3  minimize any damages awarded.  This resulted in an absence of
4  damage control.

5      Defendant accepted no responsibility whatsoever for any of
6  its actions or inactions throughout the blasting operation.  A
7  similar all or nothing approach was taken with respect to
8  damages.  The Defendant chose not to discuss damages, not to
9  offer the jury alternate theories, or describe how Plaintiff's
10 damage claims should be minimized, except portions of future
11 medical expenses, and to argue Plaintiff's damage claims were
12 over-reaching and outrageous.  Rather, Defendant assumed the risk
13 of Plaintiffs being awarded damages as requested by their
14 counsel, by failing to make any mention of or to analyze
15 Plaintiff's damage claims, except to denigrate the amount sought
16 by Plaintiff as absurd or ridiculous.  These were informed,
17 strategic choices.  Defendant is bound by them.

18     For all the reasons stated in this decision, there is no
19 reason to reallocate fault.  The Court cannot do a better job
20 than the jury did.

21     As to damages, *Buell* is very helpful and instructive.  The
22 Court has found no reported or unreported cases awarding non-
23 economic damages of $20,000,000.00 for comparable burn injuries,
24 where a victim has made the progress toward partial recovery,
25 that Plaintiff has achieved or who faces a similar future as does
26 Plaintiff.  The jury's allocation of past non-economic damages is
27 not supported by the clear weight of evidence and/or is a
28 mistake.  Undoubtedly, the jury recognized that the most severe

1   pain, agony, the greatest dislocation, uncertainty about the
2   future, and Plaintiff's greatest struggles to survive and
3   progress were in the two years and two months following the
4   accident.  However, the Plaintiff has a 35-year life expectancy
5   and faces many physical and mental challenges.  It is hard to
6   understand an allocation of 80% of total non-economic damage to a
7   time period reflecting approximately 6% of the Plaintiff's life
8   span.

9        Although comparable cases are not determinative, the Court
10  in ruling on a new trial motion is instructed by applicable law
11  to consider comparable cases and to be mindful of the State
12  damages law.  The most recent expression on remand from the
13  California Supreme Court of the California Courts is *Buell*,
14  where, the Court of Appeal in a case with injuries even more
15  catastrophic and irreversible from which no recovery will ever
16  occur, than suffered in this case, reduced a $105,000,000.00 non-
17  economic damage award to $18,000,000.00.  The final remittitur in
18  *Buell* was approximately 72% of the reduced $65,000,000.00 non-
19  economic damages award and approximately 82.2% of the original
20  $105,000,000.00 non-economic damages award.  Here, the remittitur
21  is to one-third of the original non-economic damages award
22  consistent with Mr. Hall's circumstances.

23       The Court is mindful that in *Buell*, to find the requisite
24  passion or prejudice motivation for the verdict, the Appeals
25  Court seized on the jury award which greatly exceeded the three
26  to four times specials requested by Plaintiff's counsel in
27  argument to the jury.  Here, the jury was asked by Plaintiff's
28  counsel to make a total award of $20,000,000.00 to

                              45

1  $40,000,000.00.  The award was within the gross range, requested
2  by counsel.  However, as demonstrated by the jury's verdict, the
3  total net economic damages after reductions and off-sets, amount
4  to $5,018,810.06.  Allowing an economic to non-economic damage
5  ratio of almost 1:3, well within the range of all reported
6  verdicts, a non-economic damage award of $13,333,333.00, reduced
7  by 25% for comparative fault, to $10,000,000.00, $6,000,000.00,
8  of which is allocated to past non-economic loss and $4,000,000.00
9  of which is allocated to future economic loss assures that the
10 non-economic damage award is reasonable, just, not the result of
11 passion or prejudice and negates any punishment of NAIS in this
12 case, and is supported by the clear weight of the evidence.

13     For all these reasons a remittitur is GRANTED as follows:
14 Plaintiff, Brian Hall, shall recover from NAIS, as and for past
15 wage loss (reduced by 5%) $190,867.00; future wage loss (reduced
16 by 5%) $1,887,847.00; past medical bills (reduced by 5%),
17 $1,085,961.00, future medical bills (reduced by 5%)
18 $2,123,800.00; less off-set for workers' compensation benefits of
19 21.7736% calculated by total of economic damages as a percent of
20 total damages ($269,664.94); past non-economic damages (reduced
21 to 75%) of $6,000,000.00; future non-economic damages (reduced to
22 75%) of $4,000,000.00.  This means that the total award of non-
23 economic damages is $10,000,000.00 to which is added
24 $5,018,810.06 of total damages of $15,018,810.06 for Brian Hall.

25     With these exceptions, Brian Hall's judgment remains intact.
26     Jean Hall's judgment remains intact.

27     In the event that Plaintiff fails to accept the remittitur
28 within twenty days following the date of service of this

Memorandum Decision and Order by the Clerk, a new trial shall be held on the sole issue of the amount of past and future non-economic damages.

IT IS SO ORDERED.

Dated:     March 21, 2008                        /s/ Oliver W. Wanger
                                          UNITED STATES DISTRICT JUDGE

47